Kirk Pasich (SBN 94242)
KPasich@PasichLLP.com
Anamay M. Carmel (SBN 298080)
ACarmel@PasichLLP.com
10880 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone:  (424) 313-7860
Facsimile:   (424) 313-7890

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALWAYS SMILING PRODUCTIONS, LLC, a California limited liability corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>CHUBB NATIONAL INSURANCE COMPANY, an Indiana corporation,<br><br>        Defendant. | Case No. 2:21-cv-05990<br><br>**COMPLAINT FOR:**<br><br>BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Always Smiling Productions, LLC ("Always Smiling") complains of defendant Chubb National Insurance Company ("Chubb") and alleges as follows:

## NATURE OF THIS LAWSUIT

1.      In March 2020, when the United States shut down due to the COVID-19 pandemic, Always Smiling was in the midst of production on the second season of *The Morning Show*.  Like most production companies, Always Smiling had no choice but to suspend and delay production of *The Morning Show* once it became clear that continuing principal photography could subject its cast and crew to potential exposure to SARS-CoV-2 and the risk of contracting COVID-19.  Always Smiling was also prohibited from continuing principal photography by the actions

1    and orders of international, domestic, and local civil authorities and guidance from

2    the Centers for Disease Control and Prevention, also aimed at protecting people

3    from exposure to SARS-CoV-2 and "flattening the curve."  By shutting down

4    production, Always Smiling mitigated further loss.  Still, the suspension and delay

5    of production caused Always Smiling to incur significant financial losses.

6        2.      Like most entities involved in the production of motion pictures and

7    television shows, Always Smiling had purchased insurance that promised to protect

8    it against losses from production delays and threats to the well-being of cast

9    members.  When Always Smiling turned to Chubb, its insurer, for its promised

10   insurance, it reasonably expected Chubb to cover its losses.  But instead of honoring

11   its agreement with Always Smiling, Chubb adopted arbitrary restrictions on the

12   coverage available to Always Smiling and interpreted its insurance policy in a

13   manner to deprive Always Smiling of the financial protection it purchased.  Always

14   Smiling is informed and believes, and on that basis alleges, that Chubb adopted

15   these restrictive interpretations as to Always Smiling and many of its other insureds,

16   even though its interpretations were contrary to industry custom and practice, the

17   terms of the insurance policies, and the law.  Always Smiling is also informed and

18   believes, and on that basis alleges, that Chubb adopted these interpretations to save

19   itself hundreds of millions of dollars that it otherwise would owe Always Smiling

20   and its other insureds for their covered losses.

21       3.      Chubb also asserted that to the extent any of its policy provisions refer

22   to  "direct physical loss or damage to property" as a condition for payment of losses,

23   the actual or threatened presence of SARS-CoV-2 does not constitute such "direct

24   physical loss or damage."  However, in taking this position, Chubb ignored decades

25   of court decisions holding that the presence of a hazardous substance in or on

26   property constitutes such "direct physical loss or damage to property."  Chubb also

27   has known for more than a decade that it and its insureds face a substantial risk of

28   loss from viruses and pandemics and, since 2006, has had available to it an

insurance industry standard-form exclusion applicable to certain losses caused by viruses and bacteria.  Yet, in selling the policy to Always Smiling, Chubb did not include any such exclusion.  In fact, Chubb did nothing in selling the policy to Always Smiling to limit its liability for virus or pandemic-associated risks.  Nor did Chubb warn Always Smiling that even though it did not include a virus or pandemic exclusion, it would interpret the policy as if it contained one.

4.     Chubb also refused to acknowledge that, pursuant to its and the insurance industry's long-established custom and practice and the relevant language of its insurance policy, Always Smiling is entitled to an extension of the policy beyond its stated policy expiration date through completion of production of *The Morning Show* should production be delayed, as it was here, without a reduction of any of its promised coverages and subject only to a pro rata premium adjustment. By contending otherwise, Chubb deprived Always Smiling of the coverage that it purchased and has further damaged Always Smiling by forcing Always Smiling to buy additional insurance on less favorable terms.

5.     Chubb's conduct is a breach of contract and a breach of the implied covenant of good faith and fair dealing.  Always Smiling is entitled to damages for these breaches, plus punitive damages.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction under 28 U.S.C. section 1332 based on complete diversity of citizenship between the parties and because the amount in controversy, exclusive of costs and interest, exceeds $75,000.

7.     This Court has personal jurisdiction over Chubb because Chubb conducts business in the County of Los Angeles.

8.     Venue is proper in the Central District of California pursuant to 28 U.S.C. section 1391 because a substantial part of the events or omissions giving rise to Always Smiling's loss occurred in this District, including negotiation and delivery of the Policy at issue.

## THE PARTIES

9.     Always Smiling is a California limited liability corporation whose sole member is an entity that is a citizen of California.  Always Smiling produces the television series *The Morning Show*.  *The Morning Show* is a popular television show starring Jennifer Aniston, Reese Witherspoon, and Steve Carell, that premiered on Apple TV+ on November 1, 2019.  *The Morning Show* has been nominated for and won many awards, including the Critics Choice, Emmy, Golden Globe, and Screen Actors Guild awards.

10.     Chubb is a corporation organized and existing under the laws of Indiana with its principal place of business in New Jersey.  Always Smiling is informed and believes, and on that basis alleges, that at all times material hereto, Chubb was licensed to transact, and did transact, business in California and in this District.

11.     Always Smiling is informed and believes, and on that basis alleges, that Chubb is part of the Chubb group of insurance companies.  Chubb Limited is the ultimate parent of Chubb and the other insurance companies that are part of the Chubb Group of Insurance Companies (for convenience, Chubb and the other Chubb companies hereinafter collectively are referred to as the "Chubb Group").

12.     The Chubb Group makes statements and representations on behalf of Chubb and its other member companies on its website.[1]  The Chubb Group uses its website to market its insurance products; represent the nature of its insurance products, its policy underwriting, and its claims handling; and represent the quality of insurance and services its customers will get if they do business with it.

13.     The Chubb Group has long represented to the public and to its customers, including Always Smiling, that it has special expertise in providing insurance to companies and individuals in the entertainment industry.  For example,

---

[1] https://www.chubb.com/us-en/home.html.

**COMPLAINT**

1  touting its experience in the entertainment industry, the Chubb Group states as
2  follows on its website:

3  With more than 50 years of experience in the entertainment
4  industry, we understand the challenges and opportunities
5  shaping the future, and we use our deep expertise,
6  specialized products and services, and strong claims
7  capabilities to help protect your businesses, regardless of its
8  size.[2]

9  14.   Under the title "We know entertainment," the Chubb Group states:
10  We understand the changes happening in your industry and
11  put our specialized knowledge to work for you, with
12  products and services tailored to address the unique needs
13  of entertainment businesses like yours.[3]

14  15.   On its website, the Chubb Group poses the question: "How is Chubb,
15  different?"  It answers as follows:

16  We don't just process claims, we make things right.  We
17  hope you never need to file a claim with us.  But if you do,
18  that's our opportunity to show you what "craftsmanship"
19  means in service to you.  It means Chubb people working
20  with empathy, integrity, and our legendary attention to
21  detail to make you whole. ***It means we honor the promises***
22  ***we've made to you.***  Your loved ones, your employees, your
23  home, your business reputation—these things matter.
24  These things are persona, for you and for us.

25
26

27  [2] https://www.chubb.com/us-en/campaign/pacific-campaign/pacific-tech/rediscover-entertainment/index.html.
28  [3] *Id.*

1   We're here to help.[4]

2   16.   The Chubb Group understands that because of the pandemic and

3   subsequent orders, businesses, including Always Smiling, had to take steps to

4   mitigate or reduce losses.  As the Chubb Group publicly stated on its website:

5   Our hearts go out to those affected by the COVID-19

6   pandemic.  We have been – and stand ready to continue –

7   supporting our clients, distribution partners and

8   communities.[5]

9   17.   The Chubb Group also has represented, and represents to the public:

10   **"Unprecedented events require unprecedented service"**

11   For over 200 years, we have worked hand-in-hand with our

12   clients to help them rebuild – it's in our DNA.  In response

13   to the COVID-19 pandemic, we have created several

14   programs to support our clients and the communities where

15   they live.[6]

16   18.   The Chubb Group further represents:

17   **"Our commitment to clients"**

18   We stand with our clients as partners in their business.  In

19   2019 alone, we received 3.6 million new claims and made

20   more than $18.3 billion in claims payments.  And, as the

21   world changes – and new and never-before-seen threats

22   emerge – Chubb takes pride in our continuing commitment

23   to our clients.[7]

24

25

26   ---
[4] https://www.chubb.com/us-en/claims/claims-difference.aspx (emphasis added).

27   [5] https://www.chubb.com/microsites/covid19-resource-center/index.html.

[6] https://www.chubb.com/microsites/covid19-resource-center/doing-our-part.html.

28   [7] *Id.*

6

**COMPLAINT**

19.     Indeed, the Chubb Group itself has undertaken steps in connection with its in-person events to protect against the spread of SARS-CoV-2 and COVID-19:

> During the first quarter of 2020, worldwide social and economic activity became severely impacted by the spread and threat of COVID-19.  We have taken actions to minimize risk to our employees, including restricting travel and instituting extensive work-from-home protocols.[8]

## CHUBB'S KNOWLEDGE OF THE RISK OF A PANDEMIC

20.     Chubb and other insurers were repeatedly warned over the years of the potential impact of pandemics.  In fact, in the months and years before the outbreak of the COVID-19 pandemic, there were many publicly available reports about the risks of pandemics and what insurers should do.  For example, in March 2018, one insurance industry publication cautioned:

> Even with today's technology, a modern severe pandemic would cause substantive direct financial losses to the insurance community.  In addition, indirect losses would be severe, most notably on the asset side of the balance sheet.[9]

21.     One insurance industry repository shows the "tip of the iceberg" about how much information was available to insurers on the risk of pandemics.  The Insurance Library Association of Boston, founded in 1887, describes itself as "the leading resource for and provider of literature, information services, and quality professional education for the insurance industry and related interests.[10]  The Association states on its website:

---

[8] https://s1.q4cdn.com/677769242/files/doc_financials/2020/q1/Chubb-Limited-1Q-2020-Form-10-Q.pdf.

[9] "What the 1918 Flu Pandemic Can Teach Today's Insurers," AIR (Mar. 29, 2018), https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Today-s-Insurers/.

[10] http://insurancelibrary.org/about-us/.

1      The past 20 years [have] seen the rise of a number of
2      pandemics.  *Slate* recently published an article on what has
3      been learned about treating them in that time.  We thought
4      it might be apt for us to take a look back and see what the
5      insurance industry has learned as well.[11]

6  The Association then lists more than 20 articles, reports, and white papers published

7  since at least 2007, long before Chubb sold Always Smiling the policy at issue here.

8      22.    One white paper warned as early as 2009 of a pandemic's

9  consequences on the insurance industry:

10     It is highly unlikely that the insurance industry would have
11     the financial reserves to meet the worldwide claims arising
12     out of a pandemic of this size.[12]

13     23.    Thus, Chubb has known, or should have known, for years that its

14 policies would be called on to pay perhaps hundreds of millions of dollars or more

15 to its insureds and, more specifically, knows that it could be obligated under its

16 policies to pay tens of millions of dollars to Always Smiling for losses associated

17 with viruses and pandemics.

18     24.    Given the potential liability that insurers, including Chubb, faced under

19 their policies for losses from pandemics shortly after the outbreak of SARS in 2003,

20 the insurance industry undertook to draft exclusions applicable to losses from

21 viruses and bacteria.  In 2006, the Insurance Services Office ("ISO"), the insurance

22 industry's drafting organization, considered the need to draft an exclusion that

23 would bar coverage for losses caused by a virus.[13]

24

25 [11] http://insurancelibrary.org/pandemics-and-insurance/.

26 [12] Allan Manning, White Paper on Infectious Disease Cover (updated 2009),
27 http://www.lmigroup.com/Documents/Articles/White%20Paper%20on%20Infectious%20Disease%20Cover.pdf?mc_cid=f0cee24803&mc_eid=41023ebc2c.

28 [13] "ISO is a non-profit trade association that provides rating, statistical, and actuarial

25.    On July 6, 2006, ISO prepared a circular that included a standard exclusion of loss due to viruses and bacteria as part of its filing with state insurance regulators.[14]  In that circular, it noted that examples of "viral and bacterial contaminants are rotavirus, SARS, [and] influenza," observing that "[t]he universe of disease-causing organisms is always in evolution."[15]  ISO further recognized that viruses could cause property damage:

> Disease-causing agents may render a product impure (change its quality or substance) or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property.  When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), the cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.[16]

26.    In fact, ISO expressly warned that "the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing [property] policies may face claims in which there are efforts to expand coverage and create sources of recovery for such losses, contrary to policy intent."[17]

---

policy forms and related drafting services to approximately 3,000 nationwide property or casualty insurers. Policy forms developed by ISO are approved by its constituent insurance carriers and then submitted to state agencies for review. Most carriers use the basic ISO forms, at least as the starting point for their general liability policies." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645,671 n.13 (1995).

[14] See ISO Circular, "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," (July 6, 2006), https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf.

[15] *Id.*

[16] *Id.*

[17] *Id.*

9

1   ISO introduced a standard-form exclusion entitled "Exclusion Of Loss Due to Virus

2   or Bacteria" (Form CP 01 40 07 06 and, in certain jurisdictions, Form CP 01 75 07

3   06).

4        27.   Thus, since 2006, Chubb could have used a "virus or bacteria"

5   exclusion approved for use throughout the United States.  As one recent article

6   succinctly stated, "Insurers knew the damage a viral pandemic could wreak on

7   businesses.  So they excluded coverage."[18]

8        28.   However, even though Chubb was aware of the massive losses that its

9   insureds, including Always Smiling, could face from a virus-related pandemic, it

10  still sold Always Smiling the policy without a virus, pandemic, or any other

11  potentially applicable exclusion.

**THE POLICY**

13       29.   Chubb sold Always Smiling Film Producer's Risk Policy No. 7997-45-

14  17 (the "Policy") for the stated period of November 7, 2019, to November 7, 2020.

15  A true and correct copy of the Policy is attached hereto as Exhibit A and

16  incorporated herein by reference.  Always Smiling purchased the Policy for the

17  purpose of insuring against loss in the event that production of *The Morning Show*

18  was disrupted or delayed for a covered cause of loss.

19       30.   The Policy provides $125,000,000 in Cast coverage and $1,000,000 for

20  each of the Imminent Peril, Civil or Military Authority, and Ingress And Egress

21  coverages.  *See* Ex. A, Declarations.  These limits of liability apply separately to

22  each "occurrence."

---

[18] Todd Frankel, "Insurers knew the damage a viral pandemic could wreak on businesses. So they excluded coverage," Washington Post (Apr. 2, 2020), *available at* https://www.washingtonpost.com/business/2020/04/02/insurers-knew-damage-viral-pandemic-could-wreak-businesses-so-they-excluded-coverage/.

10

**COMPLAINT**

31.    The Policy contains a "Due Diligence" clause.  This clause states that Always Smiling "shall use due diligence to avoid or diminish a loss or circumstance that may give rise to a loss or damage . . . ."  *Id.,* Conditions.

32.    The Policy also contains a condition stating that Always Smiling is to "[t]ake every reasonable step to protect the property from further damage, and to avoid or minimize any loss or damage."  *Id.*, Conditions.  The Policy states that Chubb "will pay such expenses to the extent such loss or damage is reduced."  *Id.*

33.    Under the Cast coverage, Chubb agrees to "pay for the actual **production loss** you incur due to the inability of an **essential element** or other **declared person** to commence, continue or complete their duties or performances in an **insured production** as a result of a **covered cause of loss** of such **essential element** or other **declared person**. . . ." *Id.*, Cast Coverage.

34.    **Production loss** means "additional **production costs** you necessarily incur to complete an **insured production** in essentially the same manner and within the specifications submitted to us prior to a loss . . . ." *Id.*, Definitions.

35.    **Production costs** mean "all costs directly chargeable to an **insured production**, including overhead charges included in the budget for the **insured production** . . . ." *Id.*

36.    **Covered Cause of Loss** is defined as "death, injury, sickness, kidnap, or compulsion by physical force or threat of physical force."  *Id.*, Cast Coverage.

37.    The Property and Production Media coverage includes insurance for losses attributed to Civil or Military Authority, Imminent Peril, and Ingress and Egress.

38.    Under the Civil Or Military Authority coverage, Chubb agreed to insure

the actual **production loss** you incur due to the actual or potential impairment of an **insured production** directly caused by the action of a civil or military authority … that:

11

**COMPLAINT**

1    revokes your permission to use; or prohibits access to,
2    property or facilities which are used or to be used in an
3    **insured production** . . . .”

4    *Id.*, Property and Production Media, Civil or Military Authority coverage.

5    39.    Under the Imminent Peril coverage, Chubb is obligated to
6    pay for the: reasonable and necessary costs you incur to
7    protect persons and property at a **location** from imminent
8    direct physical loss or damage caused by or resulting from
9    a peril not otherwise excluded; and **production loss** you
10   incur due to the actual or potential impairment of an **insured**
11   **production** due to actions you must take to protect persons
12   or property at a **location** from imminent direct physical loss
13   or damage caused by or resulting from a peril not otherwise
14   excluded . . . .

15   *Id.*, Property and Production Media, Imminent Peril coverage.

16   40.    Under the Ingress and Egress coverage, Chubb agreed to
17   pay for the actual **production loss** you incur due to the
18   actual or potential impairment of an **insured production**
19   when ingress to or egress from a **location** is prevented due
20   to direct physical loss or damage to property at a premises
21   contiguous to such **location** caused by or resulting from a
22   peril not otherwise excluded . . . .

23   *Id.*, Property and Production Media, Ingress and Egress coverage

24   41.    **Location** means “shooting locations, locations used for developing of
25   negatives and editing of the **insured production**; and locations used for storage of
26   property to be used in the **insured production**.” *Id.*, Definitions.

27   42.    The Cast coverage form contains a provision stating that coverage ends
28   when “the policy expires or is terminated,” or upon “completion of the **insured**

**production**," whichever occurs first.  *Id*., Cast Coverage.  This provision is reasonably understood and historically represented to mean, and in accord with custom and practice means, that the Policy would not expire on the stated expiration date if production were delayed, but instead would expire only upon completion of the production.

43.    The Property and Production Media coverage form includes an "Attachment and Determination Of Production Media Coverage" provision.  This provision states that the Production Media Coverage

> ends when the first of the following occurs:
>
> 1.    the date on which a protection copy has been completed and stored in an area physically separated from the original **production media**;
>
> 2.    30 days after completion of post-production;
>
> 3.    the expiration date shown in the Declarations; or
>
> 4.    the policy is cancelled.

*Id*., Production and Media Coverage.  This provision also is reasonably understood and historically represented to mean, and in accord with custom and practice means, that the Policy would not expire on the stated expiration date if production were delayed, but instead would expire only upon completion of the production. Furthermore, the Policy's declarations do not include an expiration date as to the Production Media coverage.

## THE COVID-19 PANDEMIC
## AND THE ENSUING CIVIL AUTHORITY ORDERS

44.    In 2020, SARS-CoV-2 and the disease it causes, COVID-19, spread throughout the world, prompting the World Health Organization to declare a global pandemic.

45.    As explained by the World Health Organization:

1   COVID-19 is caused by the SARS-CoV-2 virus which
2   spreads between people, mainly when an infected person
3   is in close contact with another.

4   The virus can spread from an infected person's mouth or
5   nose in small liquid particles when they cough, sneeze,
6   speak, sing, or breathe heavily.  These liquid particles
7   are different sized, ranging from larger 'respiratory
8   droplets' to smaller 'aerosols'.

9   Other people can catch COVID-19 when the virus gets
10   into their mouth, nose or eyes, which is more likely to
11   happen when people are in direct or close contact (less
12   than 1 metre apart) with an infected person.

13   Current evidence suggests that the main way the virus
14   spreads is by respiratory droplets among people who are
15   in close contact with each other.

16   Aerosol transmission can occur in specific settings,
17   particularly in indoor, crowded and inadequately
18   ventilated spaces, where infected person(s) spend long
19   period of time with others, such as restaurants, choir
20   practices, fitness classes, nightclubs, offices, and/or
21   places of worship.  More studies are underway to better
22   understand the conditions in which aerosol transmission
23   is occurring outside of medical facilities where specific
24   medical procedures, called aerosol generating
25   procedures, are conducted.

26   The virus can also spread after infected people sneeze,
27   cough on, or touch surfaces, or objects such as tables,
28   doorknobs and handrails.  Other people may become

14
**COMPLAINT**

infected by touching these contaminated surfaces, then touching their eyes, noses or mouths without having cleaned their hands first. [19]

46.     Published reports state that the spread of SARS-CoV-2 is insidious because it can be readily transmitted by asymptomatic individuals—about 40% of all individuals who have COVID-19 are asymptomatic.[20]  Additionally, reports state that pre-symptomatic persons carry the greatest viral-load (i.e., the quantity of virus in an individual's system) among all infected persons, meaning their ability to transmit SARS-CoV-2 is greater than that of symptomatic persons.[21]

47.     Moreover, it is widely recognized that "confirmed" cases of COVID-19 do not tell the full story.  It is well-recognized that many individuals infected with SARS-CoV-2 are asymptomatic and therefore do not get tested for the disease. Because of the initial absence of available tests, asymptomatic infection, and differential symptomatic diagnosis, it is believed that the true number of individuals infected with SARS-CoV-2 is significantly higher than the reported numbers might suggest.[22]

---

[19] *See* https://www.who.int/news-room/q-a-detail/q-acoronaviruses.

[20] Ellen Cranley, *40% of people infected with COVID-19 are asymptomatic, a new CDC estimate says*, Business Insider (July 12, 2020), https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7.

[21] Xi He, *et al*., *Temporal dynamics in viral shedding and transmissibility of COVID-19*, 26 NATURE MED. 672, 674 (Apr. 15, 2020), https://www.nature.com/articles/s41591-020-0869-5 ("We detected high viral loads soon after symptom onset, which then gradually decreased towards the detection limit at about day 21. . . . Our analysis suggests that viral shedding may begin 5 to 6 days before the appearance of the first symptoms. After symptom onset, viral loads decreased monotonically, consistent with two recent studies.")

[22] Smith-Schoenwalder, CDC Study: *Coronavirus Infection Numbers May Be up to 24 Times Higher Than Reported*, U.S. NEWS (July 21, 2020), https://www.usnews.com/news/national-news/articles/2020-07-21/cdc-study-coronavirus-infection-numbers-may-be-up-to-24-times-higher-than-reported;

48.     Published reports also state that aerosolized droplets exhaled by normal breathing can travel significant distances and stay suspended in the air and infective for 16 hours, until gravity ultimately forces them on to the nearest surface.[23]  These reports and studies explain that SARS-CoV-2 spreads primarily through fine aerosolized viral droplets that are expelled into the air when infected individuals breathe, talk, sing, cough, or sneeze.

49.     Scientists have likened the ubiquitous aerosolized droplets of the virus to smoke, present in the air long after the source of its dissemination has gone.[24] Thus, according to studies and reports, entering a location where the SARS-CoV-2 virus is physically present in the air poses an imminent and severe risk to human health.

50.     As of the filing of this Complaint, there have been more than 191,773,590 confirmed cases of COVID-19 throughout the world, with more than 4,127,900 deaths.[25]  In the United States, there have been more than 34,221,500 confirmed cases of COVID-19 with more than 609,500 deaths.[26]  Moreover, due in part to the initial absence of available tests, it has been reported that, at least in the United States, the number of people infected within SARS-CoV-2 may be ten times higher than reported.[27]

---

Johansson, Michael A et al., *SARS-CoV-2 Transmission From People Without COVID-19 Symptoms*, J. AM. MEDICAL ASS'N (Jan. 7, 2021), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707.
[23] *See* Leslie Tate, *Virus Survives In Air For Hours,* Tulanian (Fall 2020), https://tulanian.tulane.edu/fall-2020/virus-survives-in-air-for-hours.
[24] *See* "Airborne Transmission of SARS-CoV-2," *Science* (Oct. 16, 2020), https://science.sciencemag.org/content/370/6514/303.2.
[25] *See* https://covid19.who.int/.
[26] *See* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.
[27] Fiona P. Havers, Carrie Reed, Travis Lim, et al., Seroprevalence of Antibodies to SARS-CoV-2 in 10 Sites in the United States, March 23-May 12, 2020, JAMA Internal Medicine (July 21, 2020), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2768834.

51.     Since the outbreak of SARS-CoV-2 and COVID-19, and in response to it, civil authorities throughout the world issued "stay-at-home" and "shelter-in-place" orders, travel restrictions, quarantines, and other orders, including orders requiring the suspension of non-essential business operations (collectively, "Closure Orders").[28]  In relevant part, the Closure Orders required citizens to stay at home, prohibited large gatherings, and mandated the continued closure of all non-essential in-person businesses, including television productions.

52.     On March 4, 2020, Governor Newsom declared a state of emergency in California.  On March 11, 2020, Governor Newsom announced that all gatherings of 250 people or more should be rescheduled or cancelled.[29]  On March 12, 2020, Governor Newsom issued Executive Order No. N-25-20, ordering that: "All residents were to heed any orders and guidance of state and local public health officials, including but not limited to the imposition of social distancing measures, to control the spread of COVID-19.[30]

53.     Civil authorities continued to issue orders thereafter.  On March 16, 2020, the Los Angeles County Health Officer issued a civil authority order that prohibited "all indoor and outdoor, public and private events and gatherings within a confined space, where 50 or more members of the public [were] expected to gather at the same time.[31]  Additionally, on March 19, 2020, the Los Angeles Health Officer issued a "Safer at Home Order for Control of Covid-19," which prohibited

---

[28] See, e.g., The Council of State Governments, COVID-19 Resources for State Leaders, https://web.csg.org/covid19/executive-orders/.
[29] https://www.gov.ca.gov/2020/03/11/california-public-health-experts-massgatherings-should-be-postponed-or-canceled-statewide-to-slow-the-spread-of-covid-19/.
[30] https://www.gov.ca.gov/wp-content/uploads/2020/03/3.12.20-EO-N-25-20-COVID-19.pdf.
[31] https://covid19.lacounty.gov/covid19-news/public-health-issues-order-to-prohibit-group-events/.

1  all indoor and outdoor gatherings of ten or more persons, and closed all non-
2  essential businesses.[32]

3      54.    Because COVID-19 led to a global pandemic and SARS-CoV-2 is
4  statistically certain to be carried by a number of individuals who work at and visit
5  Always Smiling's sets and locations, SARS-CoV-2 is continually reintroduced to
6  the air, airspace, and surfaces of covered properties and the property of third parties.

7      55.    The entertainment industry was hit particularly hard by the pandemic,
8  orders of civil authorities, and the need to mitigate losses and damages.[33]  By the
9  end of March 2020, nearly all media productions were forced to shut down and
10  suspend operations indefinitely.[34]  As SARS-CoV-2 and COVID-19 spread around
11  the world, Always Smiling suffered losses and damages covered by the Policy when
12  it was forced to suspend and postpone production due to that spread.

13              **CHUBB'S BREACHES AND WRONGFUL CONDUCT**
14                  *Always Smiling's Claim for Coverage*

15      56.    On March 12, 2020, Always Smiling timely notified Chubb that it was
16  shutting down production of the second season of *The Morning Show* after a 12-
17  week prep and filming the first 13 days of principal photography.

18      57.    On April 15, 2020, Chubb responded to the notice of loss.  Chubb's
19  stated position was that all of Always Smiling's losses arising from the pandemic,
20  orders of civil authorities, and the need to mitigate are covered only under the
21  Policy's Civil Authority Or Military coverage, which has a $1,000,000 limit of
22  liability per occurrence.

23

24

---

25  [32] http://file.lacounty.gov/SDSInter/lac/1070029_COVID-
26  19_SaferAtHome_HealthOfficerOrder_20200319_Signed.pdf.
   [33] https://www.cnbc.com/2020/04/24/hollywoods-small-businesses-in-crisis.html.
27  [34] https://www.theguardian.com/film/2020/mar/19/loss-of-jobs-income-
   filmindustry-
28  hollywood-coronavirus-pandemic-covid-19.

**COMPLAINT**

58. Over several months, Always Smiling provided Chubb with information pertaining to its losses.

59. On September 1, 2020, Always Smiling sent a letter to Chubb stating:

As you and Chubb know, late last year there was an outbreak of a virus and disease in Wuhan, China. The virus and disease were subsequently identified by the World Health Organization as SARS-CoV-2 and COVID-19. Thereafter, as SARS-CoV-2 spread around the world, various organizations and government entities issued directives and orders, including travel restrictions, "stay-at-home" directives and closure orders.

These various events and our need to protect the cast and crew have caused us to incur substantial losses and expenses associated with the disruption of and delays in the production of *The Morning Show*. We continue to incur losses and expenses, including mitigation expenses to prevent and/or reduce the risk of declared persons contracting COVID-19. We believe that these losses and expenses are insured under our policy, and we hereby request coverage under all potentially applicable coverages, including Cast ($125,000,000 per occurrence), Civil Or Military Authority ($1,000,000 per occurrence), Imminent Peril ($1,000,000 per occurrence), Ingress and Egress ($1,000,000 per occurrence), the "Due Diligence" and "Insured's Duties In The Event Of Loss Or Damage" conditions, and the common law doctrine of mitigation.

60. Always Smiling also provided Chubb with the rough order of magnitude of its losses at that time: approximately $34,900,000. This amount was

PASICH

1  comprised of various expenses, including costs to shoot new elements, to restart

2  production, and for COVID-19-related safety protocols.

3       61.    On September 30, 2020, Chubb sent a letter essentially denying

4  coverage for most aspects of Always Smiling's loss.  Chubb refused to acknowledge

5  that any coverage other than Civil or Military Authority—the coverage with the

6  lowest potentially applicable limit—applied.  Chubb wrongly asserted that Cast,

7  Imminent Peril, and Ingress and Egress coverages did not apply.  Chubb wrongly

8  asserted that there was no Cast coverage because there were no reported cases of

9  "death, injury, sickness, kidnap, or compulsion by physical force or threat of

10  physical force."  Chubb also took the position that there was no Imminent Peril

11  coverage because even though SARS-CoV-2 is highly contagious and the resulting

12  disease, COVID-19, already had killed hundreds of thousands of people, the

13  presence of SARS-CoV-2 did not constitute "direct physical loss or damage" to

14  persons or property.  Chubb's rationale for not providing Ingress and Egress

15  coverage was because a location was not impaired by any direct physical loss or

16  damage despite the likely or threatened presence of SARS-CoV-2.  Chubb also

17  stated, in total disregard of the guidance of the world's leading health and medical

18  authorities, that it did not see how incurring costs for COVID-19-related safety

19  protocols, such as personal protective equipment, would reduce a covered loss.

20       62.    Additionally, Chubb proclaimed, in its September 30, 2020, denial, that

21  of the categories of expenses submitted by Always Smiling, only costs to shoot new

22  elements would be included in the claim.  Chubb wrongly took the position that

23  costs to restart production and for COVID-19 related safety protocols "are not

24  directly caused by an action of civil or military authority revoking [Always

25  Smiling'] permission to use or prohibiting access to property or facilities used in an

26  insured production."  In taking this position, Chubb improperly adopted a new

27  requirement not found in the Policy—that the loss must be "*directly* caused" by an

28

1    action of civil or military authority.  Chubb did not further explain how those costs

2    were not caused by the shutdown due to civil authority orders.

3          63.    By taking these positions, Chubb is depriving Always Smiling of the

4    full coverage to which it is entitled under its Policy, including $125,000,000 per

5    occurrence for Declared Persons under the Cast Insurance, $1,000,000 per

6    occurrence for Imminent Peril coverage, and $1,000,000 per occurrence under

7    Ingress and Egress coverage. Chubb also is depriving Always Smiling of the

8    promised coverage for the expenses that Always Smiling has incurred, and is

9    incurring, to avoid or minimize loss.

10          64.    Always Smiling is entitled to Cast coverage under the Policy for the

11    losses incurred from the suspensions and delays in production of *The Morning*

12    *Show*, as well as the costs and losses it incurred and continue to incur in its

13    reasonable efforts to minimize, prevent, and mitigate losses otherwise insured under

14    the Policy.  Production was postponed because of the widely reported dangers posed

15    by SARS-CoV-2 and COVID-19 and the issuance of the orders of civil authorities.

16    Always Smiling was also required "to avoid or diminish a loss or circumstance that

17    may give rise to a loss or damage."  By halting production, Always Smiling did

18    exactly that.

19          65.    Further, Always Smiling was obligated to protect persons from

20    imminent direct physical loss or damage.  Always Smiling did so and is entitled to

21    be paid for the costs incurred to protect persons as well as for the production loss

22    incurred due to the impairment of the production of *The Morning Show*.

23          66.    The likely presence of SARS-CoV-2 around shooting locations

24    rendered those areas potentially dangerous and potentially unsafe to enter.  Always

25    Smiling was unable to access its insured locations because of the proliferation of

26    SARS-CoV-2 and the resulting damage it caused at premises contiguous to shooting

27    locations.  Therefore, Always Smiling is entitled to Ingress and Egress coverage.

28

67.     On or about June 7, 2021, Chubb paid $1,000,000 to Always Smiling. Chubb asserted that this payment was a payment under the Civil Authority coverage.  Chubb contends that this payment is the total amount it owes for Always Smiling's losses.  Always Smiling accepted this payment in mitigation of its damages and under an express agreement with Chubb that its acceptance was without prejudice to, and subject to a full reservation of, all its rights.  Chubb refused to pay any more towards Always Smiling's loss, even though Always Smiling's loss exceeds $44,000,000 as of the filing of this Complaint.

### *Chubb's Refusal to Extend the Policy Period*

68.     On August 19, 2020, Chubb sent Always Smiling a notice stating that it would not renew the Policy and that coverage would otherwise cease on November 7, 2020.

69.     On August 27, 2020, counsel for Always Smiling wrote to Chubb, stating that the refusal to extend policy to cover principal photography was a "drastic, unexpected, and unwarranted change from Chubb's custom and practice." He stated:

> As Chubb well knows, its practice, fundamental to insureds'
> decisions to purchase insurance from Chubb, has been to
> extend coverage beyond a policy's expiration date when
> events cause delays in declared productions.  [The broker
> involved in procuring the policy] has confirmed that this has
> been Chubb's practice.  It was also Always Smiling's
> understanding and reasonably expectation when it
> purchased the policy, that it did not have any reason to
> believe that Chubb would change from that established
> custom and practice.  Indeed, had Chubb disclosed that it
> would take such a position, Always Smiling would have
> pursues coverage elsewhere.

70.     On October 1, 2020, Always Smiling wrote to Chubb, stating:

> As you know, Always Smiling Productions, Inc. disagrees with Chubb's positions regarding an extension of policy's stated expiration date, the loss we have submitted, and other issues.  For example, Always Smiling believes that The Morning Show is covered through completion of the planned production under the terms of the current policy.  Given Chubb's positions, and in an effort to  mitigate its damages, Always Morning is willing to consider renewal terms without prejudice to, and subject a full reservation of, all rights and remedies.

71.     Chubb never offered to extend the Policy's period or to offer a policy with comparable terms.  Instead, Chubb offered only a possible policy at a substantially higher price with substantially lesser coverage, which included a "communicable disease" exclusion that would deprive Always Smiling of coverage for losses causes by any "communicable disease," not merely losses caused by SARS-CoV-2 or COVID-19.  By refusing, without prior warning, to honor the long-established custom and practice of extending policy periods beyond a policy's stated expiration date when productions are delayed, Chubb has sought to deprive Always Smiling of the coverage promised by the Policy.  In order to mitigate its damages, Always Smiling was forced to purchase a new policy, but that purchase was expressly subject to a full reservation, and non-waiver, of Always Smiling's rights and claims

72.     On November 11, 2020, the broker involved with procuring the Policy wrote to Chubb, stating:

> [Always Smiling's] Chubb policy covers the production losses on The Morning Show (Season Two), including those losses  associated  with  COVID-19,  the  orders  of  civil

23

**COMPLAINT**

1   authority, and their steps to mitigate those losses . . . .  As
2   you also know, we believe that the Chubb policy covers
3   ongoing and future losses associated with The Morning
4   Show because of the delays in production caused by events
5   insured under the Chubb policy.  However, because of
6   Chubb's failures to confirm coverage and its position that it
7   would not insure any losses related to any "communicable
8   diseases" including microorganisms and bacterial issues
9   going forward, we believed that was necessary to purchase
10  a policy . . .  to further mitigate their potential losses.  This
11  will further confirm that your insured and client is reserving
12  all their rights against Chubb for coverage for their losses,
13  as well as for the additional premium they are paying for the
14  [other] policy.

15      73.    Always Smiling is informed and believes, and on that basis alleges, that
16  when Chubb sold Always Smiling its Policy, Chubb knew, and should have known,
17  that Always Smiling was relying on the Chubb and the industry's custom and
18  practice and that the policy period would be extended beyond its stated date if
19  needed to complete the production.

20      74.    Always Smiling is informed and believes, and on that basis alleges, that
21  when Chubb took the positions referenced above, it knew that because of the
22  pandemic, Always Smiling would be unable to procure replacement insurance
23  comparable to that provided by the Policy, including insurance without a COVID-19
24  exclusion or other substantial limitations on coverage as to losses associated with
25  COVID-19, and would, in any event, be required to pay a substantially higher
26  premium for narrower and less coverage, thereby jeopardizing Always Smiling's
27  ability to proceed with *The Morning Show*.  Chubb also knew that because Always
28  Smiling would attempt to mitigate its damages by procuring replacement coverage,

24

**COMPLAINT**

it would incur additional expense in doing so.  Despite these facts, Chubb continued its wrongful conduct.

75.    Despite the fact that production was shut down from March 15, 2020, until November 20, 2020, Chubb did not provide or offer any refund of premium, pro-rated or otherwise, for this period. Therefore, Chubb both refused to extend the Policy's expiration date or refund premium for this period, thereby creating a forfeiture of Always Smiling's coverage.

76.    To the extent not waived or otherwise excused, Always Smiling has complied with the provisions in the Policy.  Always Smiling is therefore entitled, to all benefits of insurance provided by the Policy.

## FIRST CAUSE OF ACTION

### (Breach of Contract for Refusal to Provide the Full Promised Insurance)

77.    Always Smiling realleges and incorporates by reference paragraphs 1 through 76 above.

78.    By acting as alleged above, including by limiting the number of occurrences for Civil Or Military Authority coverage to one, and by failing and refusing to pay Always Smiling for the full amount of its losses under each applicable coverage, Chubb breached its duties under the Policy.

79.    As a direct and proximate result of Chubb's breaches, Always Smiling has sustained, and continues to sustain, damages in an amount to be proven at trial above this Court's jurisdictional limit.

## SECOND CAUSE OF ACTION

### (Breach of Contract for Failure to Extend the Policy Period)

80.    Always Smiling realleges and incorporates by reference paragraphs 1 through 76 above.

81.    Chubb has and had a duty under the Policy, the law, and industry custom and practice to extend the period of the Policy beyond its stated expiration date if the completion of production if delayed beyond that stated expiration date.

82.   Chubb breached its duties under the Policy by, among other things, refusing to extend the Policy's term beyond the Policy's stated expiration date.

83.    As a direct and proximate result of Chubb's breaches, Always Smiling has sustained, and continues to sustain, substantial damages for which Chubb is liable, in an amount to be proven at trial above this Court's jurisdictional limit.

## THIRD CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

84.   Always Smiling realleges and incorporates by reference paragraphs 1 through 76, 78, 81, and 82 above.

85.   Implied in the Policy is a covenant that Chubb would act in good faith and deal fairly with Always Smiling, that Chubb would not interfere with the rights of Always Smiling to receive benefits due under the Policy, and that Chubb would give at least the same level of consideration to Always Smiling's interests as it gave its own interests.

86.   Chubb also had a duty under the Policy, the law, and insurance industry custom, practice, and standards to honor the terms of insurance promised under the Policy.

87.   Instead of complying with these duties, Chubb acted in bad faith by, among other things,

   a) restricting the insurance available under the Policy to only that insurance available under the Civil Authority coverage;

   b) insisting that Always Smiling's losses under Civil Authority coverage only include shutdown costs and not restart costs or the costs to comply with COVID-19 safety protocols;

   c) failing to promptly conduct a full and thorough investigation of the bases that would support Always Smiling's claim for coverage and request that the period of the Policy be extended beyond the Policy's stated expiration date;

d) creating and implementing a pattern and course of action to restrict coverage for all production claims relating to SARS-CoV-2, COVID-19, and subsequent events, and to seek to pay less on those claims than it is obligated to pay under the Policy;

e) unreasonably failing and refusing to honor its promises and representations in the Policy;

f) unreasonably refusing to pay the full amount due under the Policy;

g) putting its interests above those of Always Smiling; and

h) otherwise acting as alleged above.

88. In breach of the implied covenant of good faith and fair dealing, Chubb did the things and committed the acts alleged above for the purpose of consciously withholding from Always Smiling the rights and benefits which it was, and is, entitled to under the Policy.

89. Chubb's acts are inconsistent with the reasonable expectations of Always Smiling, are contrary to the express and implied terms of the Policy and constitute bad faith.

90. As a direct and proximate result of Chubb's breach of the implied covenant of good faith and fair dealing, Always Smiling has sustained, and continues to sustain, damages in an amount to be proven at trial. Always Smiling is also entitled to recover all attorneys' fees that it reasonably incurred, and continue to incur, in its efforts to obtain the benefits due under the Policy that Chubb wrongfully withheld, and is withholding, in bad faith. Always Smiling is further entitled to interest thereon at the maximum legal rate. Always Smiling continues to suffer damages because of Chubb's bad faith.

91. Always Smiling is informed and believes, and on that basis alleges, that Chubb—acting through one or more of its officers, directors, or other corporate employees with substantial independent discretionary authority over significant

1   aspects of Chubb's business—performed, authorized, and/or ratified the bad faith
2   conduct alleged above.

3       92.   Chubb's conduct is contemptible and has been done with a conscious
4   disregard of Always Smiling's rights, constituting oppression, fraud, and/or malice.
5   Chubb has engaged in a series of acts designed to deny Always Smiling the benefits
6   due under the Policy.  Specifically, Chubb, by acting as alleged above, consciously
7   disregarded Always Smiling's rights and forced Always Smiling to incur substantial
8   financial losses, thereby inflicting substantial financial damage.  Chubb ignored
9   Always Smiling's interests and concerns with the requisite intent to injure under
10  California Civil Code section 3294.  Always Smiling is therefore entitled to recover
11  punitive damages from Chubb in an amount sufficient to punish Chubb and to deter
12  similar conduct in the future.

13                          **PRAYER FOR RELIEF**

14      WHEREFORE, Always Smiling prays for relief as follows:

15                  **ON THE FIRST CAUSE OF ACTION**

16      1.   For damages, plus interest, according to proof at the time of trial;

17                  **ON THE SECOND CAUSE OF ACTION**

18      2.   For damages, plus interest, according to proof at the time of trial;

19                  **ON THE THIRD CAUSE OF ACTION**

20      3.   For damages, including attorneys' fees, plus interest, according to proof
21  at the time of trial;

22      4.   For punitive damages in an amount to be determined at the time of trial;

23                  **ON ALL CAUSES OF ACTION**

24      5.   For the costs of this lawsuit; and

25      6.   For such other, further, and/or different relief as may be deemed just
26  and proper.

27

28

1    DATED: July 23, 2021                Kirk Pasich
2                                        Anamay M. Carmel

3                                 By:    /s/ Anamay M. Carmel
4                                        Attorneys for Plaintiff

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2        Plaintiff Always Smiling Productions, LLC. hereby demands a trial by jury in

3  this action.

4

5  DATED:  July 23, 2021        Kirk Pasich
                              Anamay M. Carmel

6                                PASICH LLP

7

8             By:  _/s/  Anamay M. Carmel_
                                Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28